Mazen Hanna and Olympus Insurance v. Ward Manufacturing. June Hoffman of Fowler White Burnett for the Defendant Appellant Ward Manufacturing. As the Court is aware, this case involved a fire that destroyed a personal residence and is a subrogation action brought by the homeowners insurers against Ward Manufacturing that alleged that its gas piping product was defective, failed, and caused the fire. The theory that the plaintiff asserted at trial is that WardFlex, the tubing, was too hot, caused by a lightning strike, rather than household electrical current such that it caused the fire at issue. What's difficult in these types of cases is that household current and branch circuitry can melt during a fire and actually perforate the tubing. So there's always an issue about what came first, the perforation in the tubing or the actual current that arced from the source of the fire. Moving to the first issue, Ward was entitled to judgment as a matter of law on the strict liability claim due to the government rules defense and the insufficiency of the plaintiff's expert testimony to reflect . . . Let me just ask you a preliminary question. Jury made three distinct findings based on three distinct theories of liability. One was negligent design, the second was strict liability, and as you know, the third was failure to warn, but they were expressed specific individual findings on each of those theories of the case. You've raised a number of objections to the strict liability finding and the failure to warn about the jury's expressed findings on negligence, isn't that the end of the matter? Put differently, is there any reason why we even have to address strict liability and failure to warn if there was a sufficient foundation for the jury verdict on negligence? Your Honor, as I understand the two-issue rule that I believe you're raising, as it related to both . . . No, I understand that, but it just seems to me the guts of this lawsuit has to do with your claim that the district court clearly abused discretion in allowing in the testimony of their expert. If you're right about that, that seems to me to be a big deal, but if you're wrong about that and that evidence was properly before the jury and you had square findings on negligence, it seems to me that's essentially the end of what we have to decide. Maybe I've misapprehended this, but that's how I saw the outline of this case conceptually. What am I missing here? Sir, I believe that you're not missing anything. The key in this case is the insufficiency of Dr. Eger's testimony. Okay. Why don't you tell us about why you think there was a clear abuse of discretion on the part of the district court in allowing Dr. Eger to testify? There was an erroneous admission of Dr. Eger's testimony because under Daubert, you need to demonstrate that there are sufficient facts or data upon which the principles of an expert are reasonably applied. There was really no sufficient factual predicate here for Dr. Eger to opine that the tubing perforated and caused the fire. Significantly here, there was a pretrial Daubert motion, which was denied summarily. At trial, Dr. Eger testified that, as to the source of the arc, he testified in his deposition that it must have occurred from the HVAC system because there was zinc on the tubing. At trial, he changed his mind based upon a consult with another expert at trial the evening before that he stated at trial that it must have been the chimney flue because that was closer. Now . . . The jury heard all that, right? I mean, you all cross-examined about that. You said this. Now, you said that. What's the deal? I mean, the jury got to know about all that, didn't they? Your Honor, my first read of this case was that this really all goes to weight, not admissibility because that's ordinarily the case. You hear one side and another side on testimony, but Dr. Eger's essential testimony was that the hole in the tubing was caused by something that had zinc in it. He testified affirmatively that in order for gas to ignite from the tubing, there has to be something close to where the gas is expelling within 6 inches or 12 inches in order to create a sufficient oxygen environment for the gas to ignite. Like in your ordinary circumstance, you can have gas escaping from a tube, but it's not going to cause ignition. It's going to sort of burn out. His testimony at trial was that he didn't look at any of the plans. He didn't know where the HVAC . . . After reading his testimony, he relied on, among other things, at least the following pieces of data or evidence. One was the size of the hole, and he explained why the size of the hole was a big deal. Given its size, he said in substance . . . these are my words, not his, but he said in substance that you could infer the source being lightning rather than something in the house from the size. Second, he talked about the presence of three other physical indicia, including melting, spatter, and thermal cracking, and explained why, taken as a whole, that yielded the conclusion that he offered. Why couldn't he draw that inference and that opinion based upon those pieces of evidence he cited? Were those not the kinds of things that an expert in this field would normally rely on to opine? Those were certainly factors that he testified to go into the calculation as to whether a fire was involved with the fire, but what's significant is that he did not, in terms of determining the size of the hole, he never measured the hole. At his deposition, he said, I never did the Hagen-Guth equation, which is an equation whereby after the fact, you can measure the size of the hole and then determine how large of a lightning strike was at issue, because only a certain strength of lightning will perforate this gas tubing. He did not do the Hagen-Guth equation at his deposition. He never attended the site inspection. He did not do any personal measurements or otherwise knew where the physical layout of the CSST was in relation to other chimney flue items or HVAC items, and then at trial, he said that he could do the Hagen-Guth equation off the top of his head, and he did it right then and there at trial, which was to ward severe prejudice due to a change in a fundamental crucial liability causation issue in the case. As far as the size of the hole is concerned, although he's certainly, he's an MIT professor, he's a metallurgist, he's very well accomplished, no one's questioning his application. If I understand the heart of your argument is he did, in fact, measure, he did offer an opinion about the size, but he offered it too late in the game? Yes, sir, and there was no reliability concerning his application of those principles to underlying facts in this particular case. Did you argue in district court that the reason he should be excluded as an expert was because he's come to this opinion too late in the game, as opposed to the opinion is no good whenever he came to it? The trial counsel . . . See, I thought I heard you to say the latter rather than the former, that this is just not a reliable opinion because the foundation was insufficient, and that's where the abuse of discretion arose, as opposed to he came too late in the day to the opinion. The primary position, which was consistent with the pretrial Dalbert motion, was that there was an insufficient foundation for his opinion. Not that he came to it too late in the game. There was reference to the fact that it was new opinion during the course of Dr. Eger's trial. It was somewhat unclear as to whether there was an affirmative motion to strike at trial concerning . . . See, I didn't see that, and that's why I raised the question. Yes. Was he not in any event cross-examined about coming to this view late in the game? Yes, he was cross-examined and impeached on that. The jury had the opportunity to hear that on round one, he didn't offer that, i.e. at deposition, and on round two, only for the first time at trial, he did, and that's pretty late in the day, and that undermined his credibility. Yes, sir. But we also assert, I think fairly on this record, that the opinion still lacked sufficient foundation to be reliable. Thank you. Thank you very much. Good morning. May it please the Court. I'm Mark Utke. I represent the Appellees, Mays & Hanna, and Progressive, an Olympus Insurance Company. I'd like to focus on the testimony of Dr. Eager. As the Court is well aware, that's a focal point of the defendant's position that somehow this verdict should not stand. I would first reiterate to the Court that Dr. Eager was qualified as both a metallurgist and an arch-physicist, with arch-physics being the formation of plasma due to high-voltage electricity. He's clearly qualified to render these opinions and relied upon the same type of material that was relied upon in the Adams v. Labcorp case, which this Court decided in 2014, specifically the methodology that he used in terms of the tools that he put to use in formulating his opinions. In the Adams case, they used microscopic samples. In this case, Dr. Eager literally reviewed hundreds of x-rays, photographs, microscopic images, scanning electron microscope images, and also EDS images, which provide the atomic footprint of the stainless steel surface. I'm going to ask you a question, I guess it's really about the second, you know, he's got an opinion that the lightning strike caused the arc and that the arc caused the fire. About the second piece of it, there's this phenomenon that frankly I had not been aware of, this flame liftoff phenomenon, and that as your opponent says, there's got to be something kind of jamming the hole to cause the gas to be trapped or some such. And he said, I think that the best explanation is that it must have been between some joists or something. What's the basis for that? It's based on common construction and counsel for Ward was permitted to voir dire Dr. Eager before he presented two videotaped demonstrations of what liftoff is, and he described to the jury that when a gas comes, a pressurized gas comes out of a tube, it has to mix with air because it's too rich. And once it mixes with air, then it becomes volatile to the point where it can ignite. Dr. Eager did this by virtue of an experiment in both full speed and then he brought it down to 30 frames per second. So he showed it in slow motion so that he could show the ignition of the spatter coming off of the arcing event and actually sustaining ignition. So it was a demonstration of what liftoff is as well as what sustained ignition is, and he was able to demonstrate that to the jurors through his experiment. There was adequate cross-examination on it following the voir dire. So the experiment I guess shows that in theory this flame liftoff thing works, but was there a blueprint of the house or photos of the house or something to suggest that like, yeah, and the joist really would have been in a position to trap it, so to speak? That's my word. The house was ashes on the ground. So it would be speculative for somebody to say where a particular joist was. However, that was the purpose of the voir dire was to establish that the parameters of his experiment were similar or substantially similar to what typical construction would be in a home, and that's because the CSST is typically attached to rafters. It has to be secured to the wood framing members within the house. We also know that by virtue of having zinc in the EDS spectrography, I can't pronounce the word, in the EDS footprint of the stainless steel, we know that we had to have a metallic surface 6 to 12 inches away, which would also act as a barrier that would allow for that type of mixing. So we know by the physical evidence, the fact that there's actually zinc found in the stainless steel, 6 to 12 inches away, we know by the typical construction means the framing members are typically used to secure the CSST by small brackets. So coupling those together, I think Dr. Eger's, both the methodology he used as well as his ability to demonstrate to the jury, those findings were both reliable and based on scientific means. Dr. Eger also used established principles of science to include the Fourier heat transfer equation to determine the amount of time it would take for the molten surface to actually occur. It's based on a scientific formula used by metallurgists, based on his measurements of the scanning electron microscope images, he's able to calculate the amount of time it would have taken for that violent transfer of molten stainless steel to take place. In this case, he testified that it took 1 ten-thousandth of a second for that to happen, which also supports the fact that this was caused by lightning because household electricity could only operate at 1 one-thousandth or 10,000 times less the violence of the emission of the stainless steel as we saw in this case. In terms of the Hagen-Guth equation, it's a fancy name, but the formula is very simple. You divide the area of the hole by 2.9, and Dr. Eger was able to calculate that the area of the hole being 40 millimeters. But his expert report that was turned over initially in his deposition did not reflect having made that calculus, right? No, it did not reflect that. However, he had the measurement of 40 millimeters squared, which is the area of the hole, and dividing that by 3, one is able to determine. What are we to make of the fact that the essential opinion that he offers about that formulation is only arrived at essentially in court, as opposed to being disgorged earlier and at a time when they could have done more with it? Well, I don't think it's critical. Admittedly, I don't think that they squarely challenged his testimony on those grounds, as opposed to that it was just essentially unreliable. It wasn't well-grounded in the science of the field, and therefore should be excluded. But it is true that he didn't offer it until really very late in the day. Well, Your Honor, the tools or the analysis of where the Hagen-Youth equation comes from was contained in his report, and that's the 40 millimeters squared. Right, but he didn't apply the particular formula and say this yields or is an important part of the foundation of my opinion in his report or in his deposition. He only comes at it pretty late in the day. He did the calculation in his head at trial. Would the trial court have been within its discretion if it said, you're a day late and a dollar short, and I'm not going to let you opine at least on the basis of that equation? Whether you have a sufficient independent foundation that's sufficiently reliable to opine is another question. Could the court have done that? I know that didn't happen. I'm just trying to get at how essential this formula was to the reliability to the foundation. Two-part answer. If an objection was posed at trial, it would have been totally appropriate for or within the judge's discretion to make that call. Whether that's critical or . . . What the Hagen-Youth equation tells you is the amount of energy that it took to make that whole. It's different than the physical evidence which actually shows the whole and the actual formations of metal around it and the criteria that he used from a metallurgic standpoint to determine that this was caused by lightning as opposed to household electricity. The Hagen-Youth equation could be considered icing on the cake. We know that from the physical evidence that it happened. We know that it happened from electrical energy. That's not disputed by Ward's experts. Being able to quantify the amount of energy is not so relevant to the actual happening or the physical evidence that demonstrates what actually is before the jury. The other factor that is consistent with the evidence and the methodology used by Dr. Eger is the fact that both of the defendant's experts adopt Dr. Eger's methodology in rendering their opinions. Specifically, that's Mr. Gyszynski, who's a metallurgist, agreed that he relied upon the testing performed by Dr. Eger in both the lightning laboratory as well as his own laboratory and the testing performed on the CSST in this case to formulate his opinions. In addition, Mr. Regan, who's an engineer that testified on behalf of Ward, agreed that he was not able to eliminate that lightning arcing event caused the hole that occurred in this case. It's entirely consistent with the evidence. I think the primary difference between the defendant's experts and the plaintiff's expert was that they couldn't make the determination that this was caused by lightning. The simple fact that they didn't do any testing in a lightning laboratory, they didn't do any independent testing outside of the work in this case, and they didn't use the material that they had before them to make such conclusions, is telling. Your Honor, if the court has any specific questions regarding Dr. Eger, I'll address those. Can I ask you just one, just briefly? Counsel mentioned that the Eger flip-flop between the chimney flue and the HVAC is to the source of the zinc. Should we be troubled by that? I frankly had a hard time getting my head around that. Is his opinion simply that it's something that would give rise to a zinc residue as opposed to copper wiring, or that it's something specific and here's it? Exactly. You hit on the true meaning of when you find zinc in the atomic footprint that shows you that it orked to something metal. If you found copper, then that would be more supportive of the defendant's theory in the case that it orked to copper wiring. In this case, the fact that there's no copper in the EDS scan or visible through any scientific means is supportive of the fact that it orked to something metal. Because we know that there was lightning in the area and the other metal items within the attic, it's not so relevant whether it's a flue pipe, a piece of HVAC duct work. It's the fact that the galvanized surface of those metal surfaces contains zinc, and that shows that it orked to something metal that was not copper. The specific source of it really isn't that relevant. It's not. It's the HVAC. It's whatever. It's something metal. It's not something copper. Exactly. In that same regard, defendant's expert, Mr. Reagan, also testified that it was duct work that it orked to. He also referred to the flue pipe on the chimney, but these were all within close proximity of one another. They were found in the debris in a pile side by side with one another. Got it. Thank you. Thank you, counsel. Thank you. Dr. Eger's calculation with the Hagen-Goth equation was critical to the causation theory because in order for the CSST to perforate and fail, it had to be caused by a lightning strike. There had to be a lightning strike of 20 kilowatts, and the equation will demonstrate what amount of energy perforated the CSST. It was absolutely critical and prejudicial to Ward to have Dr. Eger do the Hagen-Goth equation on the stand and essentially . . . Right, but did you say to the trial judge what you're saying to us now? Strike the testimony. We didn't get one important prop supporting the opinion until right now. He didn't offer it to us in the deposition, and we're only getting it now, and that's the reason, judge, to strike this expert. Trial counsel did not request that relief at trial. Why isn't that fatal to your claim, at least insofar as it inheres in him coming to this application late in the day? It doesn't mean there is a sufficient foundation or that the opinion is reliable, but I don't see how you can quarrel with the opinion having been offered when you didn't quarrel at the Supreme Court a chance to address that issue. I understand and appreciate that point. What is important in my mind is that the plaintiff had the burden to demonstrate that the CSST failed due to a lightning strike and that it was ultimately too thin to sustain the lightning strike. What the evidence shows is that he did not measure the hole, he did not have affirmative, reliable evidence to demonstrate a sufficiently significant lightning strike to perforate the hole. The difficulty, it seems, I think, in light of Judge Marcus's question is that he had what was in his expert report in the deposition to begin with about the general measurement of the hole. He gets on the stand and says, yes, I can do the Hagen-Muth equation to sort of knit all of this together and you don't object. At that point, the total package is measurement plus Hagen-Muth. Why is that not reliable? Dr. Eager did not measure the hole and ultimately, he is making an assumption about the strength of the actual lightning strike based upon the application of that formula. In our opinion, that was an insufficient predicate for offering his opinion on the causation issue. Unless the court has any other questions, I stand on my brief. Thanks very much. Thank you. I think we have the case. Thank you all. We will proceed with the last case of the morning.